UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


ISMAEL CASTRO,

       Petitioner,

v.                                Case No. 8:07-cv-2081-T-33EAJ


SECRETARY DEPARTMENT OF CORRECTIONS,

       Respondent.

_____/

## ORDER

This cause is before the Court on pro se petitioner Ismael Castro's 28 U.S.C. § 2254 petition for writ of habeas corpus. Castro challenges his convictions and sentences entered by the Circuit Court for the Thirteenth Judicial Circuit, Hillsborough County, Florida. A review of the record demonstrates that, for the following reasons, the petition must be denied.

### Procedural History

On December 8, 1999, Castro was charged by indictment with first degree murder, robbery with a firearm, dealing in stolen property, and attempted arson. (Ex. 1). Castro pled not guilty. On January 31, 2001, Castro's counsel filed a motion to suppress a statement Castro made to police detectives on September 1, 1999. (Ex. 2). Also on

January 31, 2001, a jury was selected for Castro's trial. On February 1, 2001, the motion to suppress was heard and denied. (Ex. 3). The trial then proceeded. (Ex. 4). The jury found Castro guilty as charged. (Ex. 5). On February 16, 2001, the Court sentenced Castro to life in prison. (Ex. 6).

**Direct Appeal**

Castro pursued a direct appeal and his attorney, Lee Adam Cohen, filed an initial brief raising three issues: 1) whether the trial judge erred in denying the motion to suppress; 2) whether the evidence was insufficient to prove premeditation; and, 3) whether the evidence was insufficient to prove felony murder. (Ex. 7). The State filed an answer brief. (Ex. 8). Castro filed a reply brief. (Ex. 9). The second district court of appeal affirmed Castro's convictions and sentences on October 11, 2002. (Ex. 10). *Castro v. State,* 834 So. 2d 164 (Fla. 2d DCA 2002). The mandate issued December 16, 2002. (Ex. 11).

**Collateral Proceedings**

On July 16, 2003, Castro filed a pro se motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. (Ex. 12). On October 27, 2003, the state trial court entered an order denying, in part, Castro's motion for postconviction relief and ordering the State to respond. (Ex. 13). On October 7, 2004, Castro filed an amended postconviction motion. (Ex. 14). On April 13, 2005, the state trial court entered an order denying in part Castro's amended motion and ordering the State to respond. (Ex. 15). The State filed a response on April 18, 2005. (Ex. 16).

The state trial court held an evidentiary hearing on October 5, 2005. (Ex. 17). On December 9, 2005, the state trial court entered an order denying Castro's motion for

postconviction relief. (Ex. 18). Castro appealed the denial of his Rule 3.850 motion and his attorney, Jean-Jacques A. Darius, filed an initial brief raising one issue: whether the state trial court erred in denying Castro's claims of ineffective assistance of counsel. (Ex. 19).

The State filed an answer brief. (Ex. 20). On June 20, 2007, the state district court of appeal affirmed the denial of postconviction relief. (Ex. 21). The mandate issued July 11, 2007. (Ex. 22).

**The Present Petition**

Castro signed the present federal petition on November 8, 2007. The petition is timely. Castro raises four grounds for relief in his present petition. **In ground one**, Castro asserts that the denial of his motion to suppress violated his Fifth, Sixth, and Fourteenth Amendment rights. **In ground two**, Castro asserts that his conviction for first degree murder is unlawful because the evidence at trial was insufficient to prove premeditation and because the state argued both premeditated and felony murder and the jury returned a general verdict. **In ground three**, Castro asserts that his conviction for first degree murder is unlawful because the evidence at trial was insufficient to prove felony murder. **In ground four**, Castro asserts that trial counsel was ineffective for failing to properly advise Castro, for failing to pursue a voluntary intoxication defense, and for failing to investigate and present witnesses. Castro also asserts that the state trial court erred in summarily denying ground four of his motion for postconviction relief, which alleged that the trial court failed to conduct an adequate inquiry on Castro's motion to dismiss trial counsel.

**The Governing Legal Principles**

Because Castro filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir.2003). The AEDPA "establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir.2001), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (recognizing that the federal habeas court's evaluation of state-court rulings is highly deferential and that state-court decisions must be given the benefit of the doubt).

A. Standard of Review Under the AEDPA

Pursuant to the AEDPA, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The phrase "clearly established Federal law," encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent

considerations a federal court must consider." *Maharaj v. Secretary for Dep't. of Corr.*, 432 F.3d 1292, 1308 (11th Cir.2005), *cert. denied*, 549 U.S. 819 (2006). The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir.2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

If the federal court concludes that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable." *Id.*

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A determination of a factual issue made by a state court, however, shall be presumed correct, and the habeas petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e) (1).

<u>Exhaustion of State Court Remedies and Procedural Default</u>

A § 2254 application cannot be granted unless a petitioner "has exhausted the remedies available in the courts of the State; . . ." 28 U.S.C. 2254(b)(1)(A); *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998). "In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).

*See also, Henderson v. Campbell*, 353 F.3d at 891 ("A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts.")(quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)); *Snowden v. Singletary*, 135 F.3d at 735 ("Exhaustion of state remedies requires that the state prisoner fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights") (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)).

Exhaustion of state court remedies generally requires a petitioner to pursue discretionary appellate review. "'[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process, including review by the state's court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003)(citing *O'Sullivan*, 526 U.S. at 845). This is required even if the state Supreme Court rarely grants such petitions and usually answers only questions of broad significance. *O'Sullivan*, 526 U.S. at 845-46.

"The teeth of the exhaustion requirement comes from its handmaiden, the procedural default doctrine." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). Under the procedural default doctrine, "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is applicable." *Smith v. Jones*, 256 F.3d at 1138. "The doctrine of procedural default was developed as a means of ensuring that federal habeas petitioners first seek relief in

accordance with established state procedures." *Henderson v. Campbell*, 353 F.3d at 891(quoting *Judd v. Haley*, 250 F.3d at 1313).

As stated above, a procedural default will only be excused in two narrow circumstances. First, petitioner may obtain federal habeas review of a procedurally defaulted claim if he shows both "cause" for the default and actual "prejudice" resulting from the default. "Cause" ordinarily requires petitioner to demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court. *Henderson v. Campbell*, 353 F.3d at 892; *Marek v. Singletary*, 62 F.3d 1295, 1302 (11th Cir. 1995). To show "'prejudice," Castro must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his factual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir. 1991) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). Castro must show that there is at least a reasonable probability that the result of the proceeding would have been different. *Henderson v. Campbell*, 353 F.3d at 892.

Second, a petitioner may obtain federal habeas review of a procedurally defaulted claim, without a showing of cause or prejudice, if such review is necessary to correct a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Henderson v. Campbell*, 353 F.3d at 892. This exception is only available "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Henderson v. Campbell*, 353 F.3d at 892. The fundamental miscarriage of justice exception concerns a petitioner's "actual" innocence rather than his "legal" innocence. *Johnson v. Alabama*, 256 F.3d 1156, 1171 (2001) (citing

*Calderon v. Thompson*, 523 U.S. 538, 559 (1998)); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986) (explaining that a "fundamental miscarriage of justice" occurs "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent"). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). In addition, " '[t]o be credible,' a claim of actual innocence must be based on [new] reliable evidence not presented at trial." *Calderon,* 523 U.S. at 559 (quoting *Schlup*, 513 U.S. at 324) (explaining that "[g]iven the rarity of such evidence, in virtually every case, the allegation of actual innocence has been summarily rejected") (internal quotation marks omitted).

The *Schlup* Court stated that the petitioner must show constitutional error coupled with "new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial. *Schlup* 513 U.S. at 324. This fundamental miscarriage of justice exception is not available unless "the petitioner shows, as a factual matter, that he did not commit the crime of conviction." *Ward v. Cain*, 53 F. 3d 106, 108 (5th Cir. 1995) (denying certificate of probable cause)(footnote omitted).

"[t]he Supreme Court fairly recently made clear that an ineffective assistance of counsel claim being used for cause to excuse a procedural default of another claim is not itself excepted from the doctrine of procedural default." *Henderson v. Campbell*, 353 F.3d at 896. In *Edwards v. Carpenter*, 529 U.S. 446, 451- 52 (2000), a habeas petitioner argued ineffective assistance of counsel as cause for his procedural default of other constitutional

claims in his § 2254 petition. But, he had never raised this ineffective assistance claim in state court, and he was now procedurally barred from raising the claim. The Supreme Court held that unless the petitioner could establish cause and prejudice to excuse his procedural default of his ineffective assistance claim, he was barred from using it as a basis for cause to excuse his procedural default of the underlying claim. *Id.* at 451-53.

<u>No Presumption that the State Court Ignored Its Procedural Rules</u>

Finally, this Court cannot presume that a Florida court ignores its own procedural rules when the Court issues only a one-sentence denial of relief, which is essentially a summary dismissal. Such a ruling does not suggest that the state court resolved the issue on the federal claim presented. *See Coleman,* 501 U.S. 722, 735-36 (1991); *Kight v. Singletary*, 50 F.3d 1539, 1544-1545 (11th Cir. 1995) (applying procedural bar where state court's summary dismissal did not explain basis for ruling); *Tower v. Phillips*, 7 F.3d 206, 209 (11th Cir. 1993) (applying bar where state court did not rule on claims presented).

B. Standard for Ineffective Assistance of Counsel

The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, (1984), established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance: (1) whether counsel's performance was deficient and "fell below an objective standard of reasonableness"; and (2) whether the deficient performance prejudiced the defense. *Id.* at 687-88. In *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), the United States Supreme Court clarified that the prejudice prong of the test does not focus solely on mere outcome determination; rather,

to establish prejudice, a criminal defendant must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable.

A court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689-90. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690; *Gates v. Zant*, 863 F.2d 1492, 1497 (11th Cir.1989).

As observed by the Eleventh Circuit Court of Appeals, the test for ineffective assistance of counsel:

> has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight. Strickland encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir.1992) (citation omitted). Under those rules and presumptions, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir.1994).

## DISCUSSION

### Ground One

Castro asserts that the denial of his motion to suppress violated his Fifth, Sixth, and Fourteenth Amendment rights. This issue was properly raised on direct appeal and is

exhausted. However, the claim is procedurally barred because Castro did not raise the claim as a federal constitutional issue. Furthermore, the claim is without merit.

In *Duncan v. Henry*, 513 U.S. 364 (1995), the United States Supreme Court held that "[i]f state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution. If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court." *Accord, Anderson v. Harless*, 459 U.S. 4 (1982). Castro did not brief this claim as a federal constitutional claim in the state court. Therefore, the claim is procedurally defaulted.

Furthermore, Castro has shown no violation of any clearly established federal law. The clearly established federal law which applies to Castro's claim is *Davis v. United States*, 512 U.S. 452, 459 (U.S. 1994). In *Davis*, the United States Supreme Court held that police are only required to stop questioning a defendant if the defendant makes an unequivocal request for counsel. In the instant case, Castro requested to speak to the district attorney, not a defense attorney. This does not constitute an unequivocal request for counsel.[1]

At the motion to suppress hearing, the state trial court judge found the detective's testimony credible. The state trial judge stated:

---

[1] In fact, requesting to speak to the district attorney or to the prosecutor does not constitute an *equivocal* request for counsel. *See State v. Galli*, 967 P.2d 930, 934 (Utah 1998)(". . . we hold that a defendant's request to speak to a prosecutor does not constitute even an equivocal assertion of the right to counsel. Thus police are free to continue to question a suspect who has only requested to speak to a prosecuting attorney."); *Trice v. State*, 853 P.2d 203, 211 (Okla.1993).

> I'm going to find that there was not a request for an attorney. I do not find that there was any type of coercion or promises made by the detective in getting the defendant to make the statements he made. Your motion [to suppress] is denied.

(Ex. 4, p. 276). Thus, the police properly continued to question Castro after he requested to speak to the district attorney, and the trial court properly denied Castro's motion to suppress.

Ground one does not warrant habeas corpus relief.

### Ground Two

Castro asserts that his conviction for first degree murder is unlawful because the evidence at trial was insufficient to prove premeditation and because the state argued both premeditated and felony murder and the jury returned a general verdict. This issue was properly raised on direct appeal and is therefore exhausted. Nonetheless, the claim is without merit.

Castro has not shown a violation of any clearly established federal law. The clearly established federal law which applies to a claim of insufficient evidence is *Jackson v. Virginia*, 443 U.S. 307 (1979). According to *Jackson*, in order to obtain habeas corpus relief, a petitioner must establish that upon the evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found proof beyond a reasonable doubt. Castro has failed to make this showing.

There was sufficient evidence to support a finding of premeditation. Premeditation is "a fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act." *Asay v. State*, 580 So. 2d 610, 612

(Fla. 1991). Whether or not the evidence shows a premeditated design to commit a murder is a question of fact for the jury which may be established by circumstantial evidence, *Sochor v. State*, 619 So.2d 285 (Fla. 1993), and the jury is not required "to believe the defendant's version of the facts when the State has produced conflicting evidence." *Spencer v. State*, 645 So. 2d 377, 380-381 (Fla. 1994), *cert. denied,* 522 U.S. 884 (1997). The circumstances which support a finding of premeditation may include the nature of the weapon, the presence or absence of provocation, previous difficulties between the parties, the manner in which the homicide was committed, the nature and manner of the wounds, and the accused's actions before and after the homicide. *Holton v. State*, 573 So.2d 284, 289 (Fla. 1990)(citing *Larry v. State*, 104 So. 2d 352, 354 (Fla. 1958)). A murderous intent may be established by facts and circumstances of the case such as a weapon being directed at some vital spot on the victim's body, *Edwards v. State*, 302 So. 2d 479 (Fla. 3d DCA 1974), and a single gunshot can support a finding of premeditation. *Peterka v. State*, 640 So. 2d 59 (Fla. 1994). In addition, a jury may infer premeditation from a defendant's actions after the crime. *Dupree v. State*, 615 So.2d 713, 715 (Fla. 1st DCA 1993). Finally, while motive is not an essential element of homicide, where proof of a crime resets on circumstantial evidence, motive may be considered and may become important. *Norton v. State*, 709 So. 2d 87, 92 (Fla. 1997).

Here, Castro announced his plan to "jack" the victim ahead of time; Castro armed himself in advance; and once Castro was alone with the victim in an isolated location where both motive and opportunity were present, Castro told the victim to turn away and he then fired the deadly shot at the back of the victim's head, at a range so close as to assure

himself that the bullet "wouldn't miss" the intended target. In this case, the jury could have concluded that Castro's version, *i.e.*, that this was just a spontaneous reaction when the unarmed victim purportedly placed his hand on Castro's thigh, was untrue, based on conflicting evidence presented by the State. *See Holton v. State*, 573 So.2d 284, 290 (Fla. 1990). The "conflicting evidence" here included the fact that Castro had to deliberately retrieve the loaded gun, tell the victim to turn away so that the victim would not see the gun pointed at the back of his head, place the gun within a few inches of the victim's head, aim the gun directly at the back of the victim's head, and then shoot the unarmed victim at point-blank range.

In *Griffin v. State*, 474 So. 2d 777 (Fla. 1985), a store clerk was shot twice during a robbery. The Florida Supreme Court affirmed the first degree murder conviction, based on premeditation, after finding that Griffin used a particularly lethal gun, there was an absence of provocation, and the wounds were inflicted at close range and, thus, "unlikely to have struck the victim unintentionally." *Id.* at 780. In this case, in light of Castro's covert retrieval of the loaded handgun, absence of evidence of any struggle, deliberate distraction of the victim by Castro, and strategic placement of the deadly shot in the back of the victim's skull, it was unlikely that the fatal bullet "struck the victim unintentionally."

In the present case, there is competent, substantial evidence supporting the finding of premeditation based upon the inconsistencies between the evidence presented at trial and Castro's after-the-fact justification for the murder. Lamar Lynch was murdered when he received a fatal gunshot wound, execution style, at close range to the back of his head.

Consistent with his previously announced plan, Castro took Lynch's expensive jewelry and promptly pawned it for cash.

In *Perry v. State*, 801 So. 2d 78 (Fla. 2001), the defendant similarly argued that the killing was the unintentional product of his impulsive overreaction to a perceived threat while he was under the influence of alcohol and cocaine. The "perceived threat," according to Perry, was the alleged sexual advance of the 75- year-old victim made while Perry was lying on the floor in his sleeping bag at the foot of the victim's bed. However, Perry's self-serving testimony was internally inconsistent and inconsistent with evidence presented by the State. Here, as in *Perry*, in light of the strategic placement and nature of the fatal wound to the victim, and the existence of a plausible robbery motive, reasonable jurors could reject Castro's theory that the killing was merely an unintentional product of an "impulsive overreaction" to an unwanted sexual overture, and properly conclude that Castro committed this murder in a premeditated manner. *See Perry*, 801 So. 2d at 84-85.

Castro's after-the-fact justification for *why* he killed Lamar Lynch does not diminish the independent evidence of premeditation. Moreover, the unarmed victim's purported desire to rekindle the sexual relationship with Castro and Castro's claim that Lynch allegedly placed his hand on Castro's thigh was not a legitimate defense to murder. In this case, Castro made a conscious decision and he carried out his decision. Castro's multiple, deliberate and focused acts – telling the victim to turn away, retrieving the loaded gun, then taking the loaded handgun, putting it to the back of the victim's head, and making a decision to pull the trigger with the loaded gun aimed directly at the back of the victim's

skull, evidenced premeditation. The evidence was sufficient to support a finding of premeditation.

Moreover, the use of a general verdict does not require reversal. *See Morrison v. State,* 818 So. 2d 432, 452 (Fla. 2002) (where a general verdict form is used, there must be competent, substantial evidence supporting *either* premeditated *or* felony murder). A judgment of conviction for first-degree murder can be upheld, even if premeditation is lacking, on an alternative felony murder theory. *See Mungin v. State*, 689 So. 2d 1026 (Fla. 1995); San Martin v. State, 717 So. 2d 462, 470 (Fla. 1998) (holding "reversal is not warranted where the general verdict could have rested upon a theory of liability without adequate evidentiary support when there was an alternative theory of guilt for which the evidence was sufficient").

Ground two does not warrant habeas corpus relief.

### Ground Three

Castro asserts that his conviction for first degree murder is unlawful because the evidence at trial was insufficient to prove felony murder. This claim is without merit. There was sufficient evidence to support a finding of felony murder. In addition to being charged with first degree murder, dealing in stolen property, and attempted arson, Castro was also charged in a separate count with robbery with a firearm. The jury returned a guilty verdict on the charge of robbery with a firearm, and Castro was adjudicated guilty and sentenced to a concurrent term of life imprisonment on this separate robbery conviction. Castro does not challenge the sufficiency of the evidence to support his independent felony conviction for robbery with a firearm. Therefore, the State's alternate felony murder theory, premised

on the underlying felony of robbery, must be deemed valid in light of the Castro's contemporaneous, unchallenged conviction for armed robbery. *See Morrison*, *supra*.

Furthermore, according to Castro, he was just "trying to defend himself" from an unwanted sexual advance when he shot the unarmed victim in the back of the head and, "as an afterthought," removed Lynch's gold jewelry before dumping his body. A short time later, Castro returned to Lynch's apartment, rifled through Lynch's bedroom, and located some more of Lynch's jewelry, which Castro immediately purloined and pawned, consistent with his previously announced intention to "jack" Lynch for his jewelry.

In *Finney v. State*, 660 So. 2d 674, 680 (Fla. 1995), the Florida Supreme Court concluded that evidence which established that the victim's VCR was pawned by the defendant within hours of murder, that the victim's jewelry box was missing, and that the victim's bedroom was ransacked, negated Finney's "afterthought" argument. *See also, Jones v. State*, 652 So. 2d 346, 350 (Fla. 1995) (rejecting "afterthought" argument where no other motivation for murders was apparent from the record).

In the present case, at the time of the robbery/murder, Castro was unemployed and in need of money. The fact that Castro was so insistent in pawning the jewelry "right away" confirmed that Castro needed money. Castro admitted that he owed the victim $6,000. The $6,000 debt was erased with the death of Lamar Lynch. Castro also admitted that he took Lynch's gold chains before he dumped Lynch's body and that when he was rummaging through Lynch's bedroom, Castro also took Lynch's ring and gold nugget. Castro's self-serving version of "*why*" he killed Lynch-- that Lynch allegedly placed his hand on Castro's

thigh and wanted to resume their sexual relationship, is directly contradicted by the evidence of Castro's previously announced plan to "jack" Lamar Lynch for his jewelry.

In this case, as confirmed by the testimony of Richard Serrano, Castro announced the robbery motive prior to the existence of the opportunity to rob Lynch. Lamar Lynch's neighbor, Ms. Fisher, testified that Lynch always dressed nicely and wore his jewelry. Castro previously had lived with Lynch, had consensual sexual relations with Lynch and, consequently, would know that Lynch likely would be wearing his gold jewelry the night of the murder. Although Castro purportedly did not want anyone to watch him "do" powder cocaine, he simultaneously admitted that he'd "done it" in front of Maggie. Telling Lynch to turn his head, on the pretext that Castro was going to use cocaine, presented Castro with the opportunity to shoot the unsuspecting victim. The victim, who had known Castro for months, trusted Castro, wanted to resume a sexual relationship with Castro, and followed Castro's instructions and looked away, enabling Castro to fire a bullet into the back of his head. In his taped statement, Castro admitted that he was close enough to the victim that he was sure he was not going to miss.

Castro did not have to take Lynch's jewelry in order to effect his escape from the scene. After taking Lynch's gold chains, throwing Lynch's body into the pond and leaving it there, Castro went back to Lynch's house, rifled through his personal belongings, and took more of Lynch's jewelry. Castro gathered Lynch's jewelry and put it into a small black bag, and, the following day, Castro had Richard Serrano in order to pawn Lynch's jewelry. Castro determined at some point he was going to take Lynch's jewelry and he killed Lamar Lynch in order to do so. Castro took the property of Don Lamar Lynch and he used force

or violence in the course of the taking of that property. Under the facts of this case, the evidence was sufficient to support a finding of both premeditated murder and felony murder.

Ground three does not warrant habeas corpus relief.

## Ground Four

Castro asserts that trial counsel was ineffective for failing to properly advise Castro, failing to pursue a voluntary intoxication defense, and failing to investigate and present witnesses. Castro also asserts that the trial court erred in summarily denying ground four of his amended motion for postconviction relief, in which Castro asserted that the trial court failed to conduct a proper inquiry on Castro's motion to dismiss counsel. These claims were presented in Castro's amended motion for postconviction relief and the appeal from the denial of the motion.

Castro has not shown a violation of any clearly established federal law. The clearly established federal law which applies to a claim of ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668 (1984). According to *Strickland*, in order to prevail on such a claim, a Castro must prove that: (1) his counsel's performance was deficient; and (2) he sustained prejudice as a result. To show prejudice, Castro "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Castro can show neither deficient performance nor prejudice.

**1. Failure to present an intoxication defense**

Castro first contends that counsel was ineffective for failing to correctly advise Castro and failing to use a voluntary intoxication defense. Castro's claim that counsel failed to correctly advise him is conclusory and insufficient to merit relief. Castro's claim that counsel was ineffective in failing to pursue an intoxication defense is without merit.

At the evidentiary hearing, trial co-counsel, Deann Athan, testified that she had been a practicing criminal defense attorney for twenty-two years. (Vol. III, p. 534). She, along with Tom Maiello, represented Castro at trial. (Vol. III, p. 534). Throughout the trial, the defense asserted was self-defense based on Castro's defending himself from the forcible felony of rape or involuntary sexual battery. (Vol. III, pp. 534-535). Ms. Athan and Mr. Maiello pursued that defense. (Vol.III, p. 535). Ms. Athan testified about the circumstances surrounding the offense and why the defense attorneys chose to pursue a defense of self-defense. (Vol. III, pp. 539-550).

As for the decision not to pursue an intoxication defense, Ms. Athan testified that she could not say specifically what investigation concerning the intoxication defense had been done in Castro's case without looking at the file, but that "all of that is very well researched from the day that case hits the Public Defender's Office." (Vol. III, p. 558). Ms. Athan testified she did not have Castro's file with her, but that:

> . . . "it is a practice of the public defender's office to explore those issue[s] right off the bat, the issue of intoxication of drug use etc., etc.
>
> And so, I'm going to tell you that we did explore those issues probably from the first interview with Mr. Castro."

(Vol. III, pp. 537-538).

Ms. Athan testified that she was familiar with the defense of voluntary intoxication, had read a lot of case law where an intoxication defense was presented, and had presented that defense twice. Both times, her client was found guilty as charged. When asked whether she would agree that the defense is a hard sell to a jury, Ms. Athan responded, "It's an impossible sell." (Vol. III, p. 536). Ms. Athan testified that the voluntary intoxication defense has very little, if any, jury appeal. (Vol. III, p. 536). She also testified that voluntary intoxication was not a defense that she ever tactically would have advised Castro to pursue. (Vol. III, p. 538).

Ms. Athan testified that there was nothing in Castro's statement to the police that led her to believe that he was so intoxicated that he could not form criminal intent. (Vol. III, p. 543). Ms. Athan testified that Castro's actions after the shooting showed that he had the presence of mind to react. (Vol. III, pp. 545-546).

Ms. Athan agreed that self-defense and voluntary intoxication were not mutually exclusive defenses. (Vol. III, p. 558). She then testified:

> . . . But, it's my opinion that voluntary intoxication defense is the defense of last resort. That it turns juries off. I have had cases in which my client's- - my client has been delusional, hearing voices and being commanded by God and the radio and the jury didn't go for it. So, I would not have muddied the waters of the self defense claim with a voluntary intox case defense.

(Vol. III, p. 558).

Ms. Athan's testimony shows that the decision not to pursue a voluntary intoxication defense was a reasonable, tactical decision and Castro has shown no deficient performance by counsel.

Furthermore, Castro has shown no prejudice. During the cross-examination of Dr. Buffington, the prosecutor went through many of Castro's actions during and after the murder. (Vol. III, pp. 527-529). Ms. Athan testified that there was nothing in Castro's statement to the police that led her to believe that he was so intoxicated that he could not form criminal intent. (Vol. III, p. 543). Ms. Athan agreed that in Castro's statement to the police, "he had a very vivid and good detailed memory of this event and the disposal of evidence afterwards." (Vol. III, p. 562). Based on Ms. Athan's testimony that juries rarely accept an intoxication defense, and the evidence of Castro's ability to think clearly at the time of and after the murder, it is clear that there is not a reasonable probability that the outcome of Castro's trial would have been different had the attorneys pursued a voluntary intoxication defense.

Following the evidentiary hearing, the state trial court entered an order denying Castro's claim that counsel was ineffective for failing to advise him and failing to present an intoxication defense. The order reads, in pertinent part:

> In ground one of his original Motion for Post-Conviction Relief, Defendant alleged ineffective assistance of counsel for failure to utilize the voluntary-intoxication defense. Specifically, Defendant contends that his counsel was aware that Defendant informed the Detectives in his case that he had snorted cocaine on the night of the offenses. Defendant alleges further that his trial counsel was unaware that the voluntary-intoxication defense was available to Defendant, and that the trial transcripts reflect clearly that counsel advised Defendant incorrectly that he was not entitled to a voluntary-intoxication defense. The Court first notes that Defendant's trial counsel was aware that the voluntary-intoxication was available to Defendant. (*See* Order Denying, In Part, Amended Motion for Post-conviction Relief and Order to Respond, attached). With respect to ground one, therefore, the issue before the Court in the October 5, 2005, hearing was why defense counsel did not utilize the voluntary-intoxication defense.

The Court notes that, in *Jones v. State*, the Florida Supreme Court held that counsel was not ineffective for failing to utilize the voluntary-intoxication defense where that choice was strategic, and where there was no credible evidence available to support such a defense. *Jones v. State*, 855 So. 2d 611 (Fla. 2003). In an evidentiary hearing in that case, the defense attorney testified that he chose not to pursue the intoxication defense because "it was his experience that juries did not accept voluntary intoxication as a defense or mitigating factor, especially when the charge is murder." *Id.* at 616. The Court found that the evidence supported the determination that "counsel's decision not to pursue an intoxication defense was a reasonable, strategic one." *Id.* Additionally, the Florida Supreme Court has also that counsel is "not ineffective for failing to employ a voluntary intoxication defense where, at an evidentiary hearing, defense counsel testified that he considered an intoxication defense but determined that it was not a viable defense based on the facts of the case." *Id.* (referring to *Stewart v. State*, 801 So. 2d 59, 65 (Fla. 2001)).

At the October 5, 2005, hearing, Ms. Athan, Defendant's co-counsel,[1] testified as follows:

> I believe that voluntary intoxication [] is a defense that is impossible for a jury to accept because they are not -- they don't want to excuse someone for voluntarily becoming intoxicated. And I have never -- I have run it twice when I thought I had very strong, very strong cases and both times the jury has came [sic] back guilty as charged, and they weren't murder cases. So, in a murder case it's hard because you've got a dead body. And so voluntary intoxication never, not in this case. Because he -- he didn't -- he didn't, although there was heavy drug use he didn't exhibit any of the symptoms that I felt put him over that edge.

Transcript, October 5, 2005, p. 74, attached.

[1] Defendant's other co-counsel, Tom Maiello, did not testify; however, the State made it clear that their reason for not calling him to testify was because they could not contact him:
> [Ms. Athan] was co-counsel. A [sic] far as Mr. Maiello [sic] to the court is aware there is no pernicious intent by the State not to call him. I was unable to get service on him or contact him. I don't know if he's changed his offices or what's going on but regards to that, as far as counsel's argument, Judge, it is not an issue of what's available to the defense.
Transcript, October 5, 2005, p. 84, attached.

Further, when asked by the State whether Defendant's "actions at the time of the murder and his actions after the murder were consistent with a voluntary

intoxication defense," Ms. Athan testified that "it was not a defense that I ever tactically would have chosen to advise [Defendant] to do." *Id.* at 49, attached. Additionally, as to whether credible evidence existed to support such a defense, Ms. Athan testified that she was not aware of any other such proof. (*See id.* at 48, attached).[2]

> [2] To emphasize the lack of credible proof to support a voluntary-intoxication defense, the State argued in its closing argument that, other than Defendant's roommate at the time of the murder, "coming in here today four years later telling this Court about this big drunk binge they were on, the only evidence of drug use is through his statements to the police and it is inconsistent with his actions." *Id.* at 87.

After reviewing the evidence presented at the hearing, the Court finds that, following *Jones v. State* and *Stewart v. State*, counsel's decision not to utilize a voluntary-intoxication defense was reasonable, and thus, Defendant did not receive ineffective assistance of counsel. As such, Defendant warrants no relief on ground one of his Motion for Post-Conviction Relief.

(Ex. 18, R 441-443).

Castro has not shown that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

## 2. Failure to present witnesses

Castro also claims that trial counsel was ineffective for failing to investigate and present witnesses. Specifically, he claims counsel should have called Alex Torres and Magyailine Molina as to testify at trial. Castro had asserted in his amended Rule 3.850 motion that Mr. Torres and Ms. Molina would have testified regarding his intoxication and that they did not see him with a gun.

At the evidentiary hearing, Mr. Torres testified that Castro snorted cocaine and smoked marijuana the night before the murder. (Vol. III, p. 498). The two men were at Mr. Torres' apartment. At some point, Mr. Torres left the apartment to be with his girlfriend, who was ill. (Vol. III, p. 500). Castro had left the residence several hours prior to Mr. Torres' leaving. Castro returned as Mr. Torres was preparing to leave. During the several hours that Castro was gone, Mr. Torres did not know whether Castro had been using drugs. (Vol. III, p. 501).

Castro told Mr. Torres that he had killed the victim and Mr. Torres kicked Castro out of his apartment. (Vol. III, pp. 504-505). Mr. Torres testified that Castro was able to carry on a conversation with him right before he left the apartment. (Vol. III, pp. 515- 516). Ms. Molina did not testify and postconviction counsel made no argument relating to ground three.

Castro cannot show counsel was ineffective for failing to call Mr. Torres and Ms. Molina as witnesses because he has failed to show the prejudice required to support an ineffective assistance claim. As for Ms. Molina, she did not testify at the evidentiary hearing and Castro has failed to show that her testimony would have been beneficial to the defense. As for Mr. Torres, his testimony at the evidentiary hearing did not establish that Castro was so intoxicated at the time of the murder that he was unable to form premeditation and Castro has not shown that there is a reasonable probability that the outcome of his trial would have been different had Mr. Torres testified for the defense.

**3. Trial court error -- failure to dismiss trial counsel**

Finally, Castro argues that the trial court erred in summarily denying ground four of his amended Rule 3.850 postconviction motion, in which he alleged that the trial court erred in failing to conduct an adequate inquiry on Castro's motion to dismiss trial counsel. Castro should have raised this claim on direct appeal, and was procedurally barred from raising it in a postconviction motion.

The state trial court denied this claim in an order that reads, in pertinent part:

> In ground 4 of his Amended Motion, Defendant alleges the trial court failed to conduct an adequate *Nelson* hearing upon Defendant's motion to terminate counsel for ineffectiveness and incompetence, pursuant to *Nelson v. State*, 274 So. 2d 2546 (Fla. 1th DCA 1973). Defendant concedes the trial court held a hearing, and heard testimony regarding his motion to terminate counsel and denied his motion, but alleges counsel was not honest in his testimony and the court failed to make "rulings as to the sufficiency of any of the ineffectiveness claims."
>
> However, the Court finds that ground 4 is an issue which could and should have been raised on direct appeal. The Second District Court of Appeal has held that the issue of "whether or not the trial court erred in denying defendant's request for a discharge of counsel by failing to follow the proper procedures as required by the case law could have been determined from the record on direct appeal." *Jenkins v. State*, 794 so. 2d 654 (Fla. 2d DCA 2001)(quoting *State v. Green*, 476 So. 2d 321, 322 (Fla. 2d DCA 1985)). Moreover, "[p]ostconviction proceedings are not to be used as a second appeal, and thus, those matters which were raised or could have been raised in the original appeal cannot again be raised in a 3.850 motion." *King v. State*, 597 So. 2d 780, 782 (Fla. 1992)(citing *Medina v. State*, 573 So. 2d 293 (Fla. 1990)). Accordingly, this claim is not cognizable in the instant motion. As such, no relief is warranted on ground 4 of Defendant's amended motion.

(Ex. 18 R 449-450).

The state trial court found that this claim was procedurally barred. Because the claim was procedurally barred in state court, the claim is procedurally barred in this Court unless Castro can show cause and prejudice to overcome the procedural bar, or show that

manifest injustice will occur if this Court does not reach the merits of this claim. Castro has failed to do so.

The evidence against Castro at trial was overwhelming. Not only did he confess, but the State proved the elements of the crimes with which Castro was charged. Castro has not overcome the state courts' findings with clear and convincing evidence.

### Final Comments

On February 19, 2009, Castro filed a motion requesting record expansion and an evidentiary hearing and a motion for appointment of counsel. (Doc. No. 23). Castro seeks to have his taped statement added to the record and seeks an evidentiary hearing on ground one of his petition, in which he asserts that the state trial court erred in denying his motion to suppress statements. Castro also seeks to have counsel appointed to represent him at the requested evidentiary hearing.

The audiotape of Castro's statement to law enforcement is unnecessary for a resolution of the claims raised in this Court. The audiotape was transcribed during Castro's trial. (See Response to Petition for Writ of Habeas Corpus, Ex. 4, pp. 695, 698-747). Castro has made no claim that the transcript is inaccurate. Thus, the tape itself is not necessary. An evidentiary hearing is not necessary because a full and fair hearing on Castro's motion to suppress statements was held in the state trial court. (See Response to Petition for Writ of Habeas Corpus, Ex. 3).

"A federal court must hold an evidentiary hearing only where the facts are in dispute, and then only if the appellant did not receive a full and fair evidentiary hearing in state court." *Hampton v. Wyrick*, 606 F.2d 834, 836 (8th Cir. Mo. 1979). Where a defendant is

granted a full and fair hearing in state court, he is not entitled to an evidentiary hearing in the federal courts. *See Beardslee v. Woodford*, 358 F.3d 560 (9th Cir. Cal. 2004). In this case, Castro was granted a full and fair hearing on his motion to suppress in state court and is not entitled to an evidentiary hearing in this Court. Because an evidentiary hearing is not necessary, appointment of counsel for such a hearing is also not necessary.

Accordingly, the Court orders:

1. That Castro's motion to expand the record; for an evidentiary hearing; and for appointment of counsel for the hearing (Doc. No. 25) is denied.

2. That Castro's 28 U.S.C. § 2254 petition is denied. The Clerk is directed to enter judgment against Castro and to close this case.

## CERTIFICATE OF APPEALABILITY AND
## LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue ⋯ only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further, ' " *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v.*

*Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner has not made the requisite showing in these circumstances.

Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

ORDERED at Tampa, Florida, on March 23, 2009.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Counsel of Record
Ismael Castro